Mickel Wayne LAMBETH,
Jr., Appellant,

v.

The STATE of Texas, State.

No. 2–04–140–CR.

Court of Appeals of Texas,
Fort Worth.

April 5, 2007.

Robert Kersey, Granbury, for appellant.

R. Kelton Conner, County Attorney, Stuart V. Neal, Assistant County Attorney, Hood County, Granbury, for appellee.

## OPINION ON REHEARING EN BANC

JOHN CAYCE, Chief Justice.

Following the issuance of our original opinion, appellant Mickel Wayne Lambeth, Jr. filed a motion for en banc rehearing. Appellant's motion for en banc rehearing is granted. We withdraw our opinion and judgment of November 23, 2005, and substitute the following in their place.

### I. Introduction

Appellant appeals his conviction for possession of less than two ounces of marijuana. In two issues, he contends that the trial court erred in denying his motion to suppress. In his first issue, appellant argues that the troopers wrongfully detained him in the absence of continuing reasonable suspicion. In his second issue, he asserts that the State failed to prove by clear and convincing evidence that his consent to the search was voluntary. We affirm.

### II. Background Facts

At 10:11 p.m. on September 10, 2003, Department of Public Safety Troopers Randall Wilson and Jim Hatfield stopped appellant because he was speeding.[1] After pulling appellant over, Trooper Wilson approached the driver's side of the vehicle and asked appellant for his driver's license and insurance card. Appellant complied and informed Trooper Wilson that his license had expired and that the vehicle belonged to his mother. Trooper Wilson

---

1. The stop was videotaped by a camera mounted on the patrol car and audiotaped by a microphone worn by Trooper Wilson. The tape was admitted into evidence, and we have viewed it as part of our review of the record.

then asked appellant to step outside of the vehicle. Appellant volunteered that he was driving to his boss's house to pick up paint. When Trooper Wilson observed that the car was not registered, appellant explained that another officer had removed the expired registration sticker during a previous traffic stop. Trooper Hatfield, who was standing on the passenger's side of the vehicle, inspected the interior of appellant's car with a flashlight.

At 10:13 p.m., appellant exited the vehicle. Trooper Wilson then began questioning him about why he was driving with an expired driver's license. Appellant told him that he had been unable to renew his license because of some legal trouble stemming from a family matter in Corpus Christi. He went on to explain that the State had charged him with theft because he took some property from a cousin who owed him money. Appellant denied having any outstanding warrants, however, and invited Trooper Wilson to run a warrant check on him. Trooper Hatfield called in a warrant check at 10:14 p.m.

At approximately 10:15 p.m., four minutes into the stop, Trooper Wilson began administering field sobriety tests because he smelled alcohol on appellant's breath. While Trooper Wilson was administering the sobriety tests, appellant admitted drinking two beers just before leaving his mother's house. The tests were completed at 10:22 p.m.

After determining that appellant was not intoxicated, Trooper Hatfield and Trooper Wilson questioned appellant about a suspicious object in his vehicle, his destination, and warrants. Trooper Hatfield asked appellant to identify an object in the back seat of his vehicle,[2] which he did. Trooper Wilson then asked appellant about his destination and warrants. Appellant reiterated that he was on his way to his boss's house, and, although he did not know the address, he explained how to get there. When asked about outstanding warrants, appellant admitted having had some warrants in Hood County and a warrant for theft from Corpus Christi, but he said that he had taken care of them.

At 10:26 p.m., about fifteen minutes into the stop, Trooper Wilson then asked appellant if he had any contraband in the vehicle and if appellant would consent to a search of his vehicle. Appellant said he had no contraband in the vehicle, but he refused to consent to a search because the vehicle belonged to his mother. When Trooper Wilson suggested calling appellant's mother to obtain her consent, appellant said he could not remember his mother's phone number and then said that his mother did not actually have her own phone but used his sister's cell phone. Appellant indicated that he had the cell phone number in his vehicle. Trooper Wilson asked for appellant's consent to search the vehicle several more times before turning to the matter of the vehicle's ownership.[3]

█ At 10:32 p.m., Trooper Wilson asked appellant, "How do we know [the car is] not stolen?" and returned to his patrol car where he called dispatch to request a license plate check and a canine unit,[4] leaving Trooper Hatfield with appel-

---

**2.** Appellant indicated that the object in question was a perfume bottle.

**3.** During this exchange, Trooper Hatfield took Trooper Wilson aside and informed him that there was an object in appellant's vehicle that he could not identify. His concern prompted a pat down search of appellant. Trooper

Wilson did not find anything suspicious on appellant's person.

**4.** Trooper Wilson told the canine officer that appellant had denied consent to a search and that possibly "something" was in the vehicle. Because the request for a canine unit oc-

lant. During the brief four minutes that Trooper Wilson was in the patrol car, the videotape shows Trooper Hatfield and appellant in front of the car talking to one another.[5]

At 10:36 p.m., the videotape records Trooper Hatfield announcing that he smells marijuana on appellant and appellant admitting that he "smoked some."

> [TROOPER HATFIELD]: *That's what I'm smelling . . . like marijuana . . . .* [Emphasis supplied.]
>
> [APPELLANT]: I don't have any, but I smoked some.

Immediately after this exchange, Trooper Wilson said that he was going to issue appellant citations for driving with an expired license and for driving without a valid registration. During the next two minutes, Trooper Wilson finished the process of writing the citations and handed them to appellant for his signature.

Upon obtaining appellant's signature on the citations, Trooper Wilson informed appellant that he was not free to leave because Trooper Wilson had called the canine unit to conduct a free-air search of the vehicle. As they waited, Trooper Wilson read appellant his rights. When he finished, appellant told the troopers where to look for his marijuana. The troopers ultimately found a bag containing less than two ounces of marijuana between the passenger seat and center console of the vehicle.

At trial, appellant moved to suppress the marijuana when the State moved to enter it into evidence and again at the close of appellant's case. The trial court denied the motion both times. A jury found appellant guilty of possession of less than two ounces of marijuana and sentenced him to probation. The trial court suspended the terms and conditions of his probation pending the outcome of this appeal.

## III. Standard of Review

■ We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review.[6] In reviewing the trial court's decision, we do not engage in our own factual review.[7] At a suppression hearing, the trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony.[8] Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor.[9] However, we review de novo the question of whether a specific search or seizure is "reasonable" under the Fourth Amendment.[10]

---

curred before the initial stop ended, it was not necessary for Trooper Wilson to have possessed separate reasonable suspicion at the time he made the call. *See State v. Parnell,* Nos. 03–00–00156–CR, 03–00–00157–CR, 2000 WL 1124964, at *7 & n. 7 (Tex.App.-Austin, August 10, 2000, pet.ref'd) (not designated for publication).

5. The conversation between Trooper Hatfield and appellant during this four-minute interval is inaudible because the microphone was attached to Trooper Wilson.

6. *Carmouche v. State,* 10 S.W.3d 323, 327 (Tex.Crim.App.2000); *Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App.1997).

7. *Romero v. State,* 800 S.W.2d 539, 543 (Tex. Crim.App.1990); *Best v. State,* 118 S.W.3d 857, 861 (Tex.App.-Fort Worth 2003, no pet.).

8. *State v. Ross,* 32 S.W.3d 853, 855 (Tex.Crim. App.2000), *modified on other grounds, State v. Cullen,* 195 S.W.3d 696 (Tex.Crim.App.2006).

9. *Johnson v. State,* 68 S.W.3d 644, 652–53 (Tex.Crim.App.2002); *Best,* 118 S.W.3d at 861–62.

10. *See Ornelas v. United States,* 517 U.S. 690, 691, 116 S.Ct. 1657, 1659, 134 L.Ed.2d 911 (1996); *Kothe v. State,* 152 S.W.3d 54, 62 (Tex.Crim.App.2004).

## IV. Reasonable Suspicion

In his first issue, appellant does not challenge the reasonableness of the initial traffic stop or Trooper Wilson's decision to detain him long enough to perform sobriety tests. Instead, he contends that the troopers were required to issue his citations and release him as soon as they determined he was not intoxicated. According to appellant, it was unreasonable for the troopers to prolong appellant's detention beyond this point.

A police officer may lawfully stop and detain a person for a traffic violation.[11] A routine traffic stop resembles an investigative detention.[12] During the detention, the officer may request information concerning the driver's license, ownership of the vehicle, the driver's insurance information, the driver's destination, and the purpose of the trip.[13] An officer may also conduct a warrant check to determine whether the driver has any outstanding warrants,[14] conduct a pat down search of the driver for weapons,[15] and request the driver's consent to search his vehicle.[16]

An investigative detention must be temporary, and the questioning must last no longer than is necessary to effectuate the purpose of the stop.[17] In determining whether the duration of an investigative detention is reasonable, "common sense and ordinary human experiences must govern over rigid criteria."[18]

Once an officer concludes the investigation of the conduct that initiated the stop, continued detention of a person is permitted for the purpose of issuing a citation.[19] A detention may also be prolonged beyond the point when the purpose of the initial stop is complete if there is reasonable suspicion to believe another offense has been or is being committed.[20]

"Reasonable suspicion" exists if an officer has specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect that a particular per-

---

11. *See Garcia v. State,* 827 S.W.2d 937, 944 (Tex.Crim.App.1992); *Mohmed v. State,* 977 S.W.2d 624, 628 (Tex.App.-Fort Worth 1998, pet. ref'd).

12. *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 3149–50, 82 L.Ed.2d 317 (1984); *State v. Cardenas,* 36 S.W.3d 243, 246 (Tex.App.-Houston [1st Dist.] 2001, pet. ref'd).

13. *Mohmed,* 977 S.W.2d at 628.

14. *Smith v. State,* 840 S.W.2d 689, 692 (Tex. App.-Fort Worth 1992, pet. ref'd); *Petty v. State,* 696 S.W.2d 635, 639 (Tex.App.-Dallas 1985, no pet.).

15. *See Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968).

16. *See Florida v. Bostick,* 501 U.S. 429, 435, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991); *Hunter v. State,* 955 S.W.2d 102, 104 (Tex.Crim.App.1997).

17. *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983); *Bal-*

*entine v. State,* 71 S.W.3d 763, 770–71 (Tex. Crim.App.2002); *Davis v. State,* 947 S.W.2d 240, 245 (Tex.Crim.App.1997).

18. *United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985).

19. *Kothe v. State,* 152 S.W.3d 54, 65 n. 43 (Tex.Crim.App.2004) (citing with approval *United States v. Wellman,* 185 F.3d 651, 656 (6th Cir.1999), which holds that prolonging a detention for the purpose of issuing the citation is "well within the bounds of the initial stop"); *see Coleman v. State,* 188 S.W.3d 708, 719 (Tex.App.-Tyler 2005, pet. ref'd) (holding that purpose of stop was complete upon the issuance of the citation), *cert. denied,* —— U.S. ——, 127 S.Ct. 502, 166 L.Ed.2d 376 (2006).

20. *United States v. Brigham,* 382 F.3d 500, 510–11 (5th Cir.2004); *Davis,* 947 S.W.2d at 245; *McQuarters v. State,* 58 S.W.3d 250, 256 (Tex.App.-Fort Worth 2001, pet. ref'd).

son has engaged or is (or soon will be) engaging in criminal activity.[21] The officer must be able to articulate more than an "inchoate and unparticularized suspicion or 'hunch'" of criminal activity.[22] The circumstances that raise suspicion that illegal conduct is taking place need not be criminal in themselves; however, the suspicious conduct relied upon by an officer must be sufficiently distinguishable from that of innocent people under the same circumstance to clearly, if not conclusively, set the suspect apart from them.[23] The existence of reasonable suspicion is determined by considering the totality of the circumstances.[24]

In this case, the purpose of the traffic stop was not complete until the troopers had finished their investigation of all possible offenses that they reasonably suspected appellant may have committed, obtained all the information they needed to write the citations, and issued the citations to appellant. Following the administration of the field sobriety tests, Troopers Wilson and Hatfield proceeded to ask appellant legitimate questions related to matters within the scope of the traffic stop, including whether he had outstanding warrants, where he was going, why his vehicle was not registered, and who owned the vehicle.[25] At the conclusion of this activity, Trooper Wilson began the process of writing and issuing the citations. All of these routine tasks were well within the bounds of the initial traffic stop, and it was lawful for the troopers to detain appellant for the purpose of completing them. Two minutes before the stop was completed by the issuance of the citations by Trooper Wilson, however, Trooper Hatfield detected the odor of marijuana on appellant.[26] This smell of marijuana gave the troopers reasonable suspicion that another offense had been committed and justified appellant's continued detention for a canine search after the purpose of the initial stop was complete.[27]

Therefore, we hold that appellant's detention after the field sobriety tests were administered was reasonable and necessary to effectuate the purpose of the initial

21. *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880; *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim.App.2001); *McQuarters*, 58 S.W.3d at 255.

22. *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000).

23. *Davis*, 947 S.W.2d at 242; *Crockett v. State*, 803 S.W.2d 308, 311 (Tex.Crim.App. 1991).

24. *Garcia*, 43 S.W.3d at 530; *McQuarters*, 58 S.W.3d at 255.

25. *See Mohmed*, 977 S.W.2d at 628 (holding that officers may question motorists about their license, registration, and travel plans); *Smith*, 840 S.W.2d at 692; *Petty*, 696 S.W.2d at 639 (both holding that officers may check for outstanding warrants during a traffic stop).

26. We decline appellant's invitation to review the credibility of Trooper Hatfield's detection of the marijuana odor de novo. Although the trial court did not make express findings of fact, we will assume that the trial court found that Trooper Hatfield smelled marijuana on appellant because that finding supports the court's decision to deny appellant's motion to suppress and it is supported by the record. *See Carmouche*, 10 S.W.3d at 328. As a finding of historical fact, we give it almost total deference. *See Johnson*, 68 S.W.3d at 652–53; *Best*, 118 S.W.3d at 861–62.

27. *See Coleman*, 188 S.W.3d at 719 (holding that, although the investigation of the traffic offense that served as the basis for the stop was complete when the officer issued the citation, the officer's continued detention of the appellant thereafter for a canine search was lawful because, during the investigation of the traffic offense, the officer had developed a reasonable suspicion that the appellant had committed a drug-related offense).

stop, and that the purpose of the stop was not complete until the citations were issued to appellant. Because the evidence shows that Trooper Hatfield smelled marijuana on Appellant before the initial stop was complete, the troopers possessed reasonable suspicion to prolong appellant's detention until a canine search could be conducted. We overrule appellant's first issue.

## VI. Consent

In his second issue, appellant argues that the State failed to prove by clear and convincing evidence that his consent to the search was voluntary.

The State bears the burden of proving voluntary consent by clear and convincing evidence.[28] We will not reverse the trial court's finding of valid consent unless it is clearly erroneous.[29]

To be valid, a consent to search must be positive and unequivocal and must not be the product of duress or coercion, either express or implied.[30] Voluntary consent is not shown by a mere acquiescence to a claim of lawful authority.[31] Whether consent was given voluntarily is a question of fact to be determined from the totality of the circumstances.[32]

Appellant did not give his consent to the vehicle search in response to a request from Trooper Wilson or Trooper Hatfield. In fact, the troopers did not ask for appellant's consent to search the vehicle after issuing his citations. Rather, appellant volunteered to show them his marijuana when Trooper Wilson was reading him his rights. Trooper Wilson continued reading appellant his rights, and, when he was through, appellant again volunteered to show them where it was. Trooper Wilson explained that he could not let appellant reenter the vehicle. Appellant then told Trooper Hatfield where to look. Under these circumstances, we hold that appellant's consent to the search was positive and unequivocal and not the product of duress or coercion, either express or implied.[33]

Because appellant consented to the search of his vehicle, the subsequently discovered evidence is not inadmissible as "fruit of the poisonous tree." [34] Therefore, the trial court did not abuse its discretion by denying appellant's motion to suppress. We overrule appellant's second issue.

## VII. Conclusion

Having overruled both of appellant's issues, we affirm the trial court's judgment.

WALKER, J. filed a dissenting opinion in which LIVINGSTON and DAUPHINOT, JJ., joined.

---

**28.** *Carmouche,* 10 S.W.3d at 331; *Reasor v. State,* 12 S.W.3d 813, 818 (Tex.Crim.App. 2000); *State v. Ibarra,* 953 S.W.2d 242, 245 (Tex.Crim.App.1997).

**29.** *United States v. Dortch,* 199 F.3d 193, 201 (5th Cir.1999); *United States v. Shabazz,* 993 F.2d 431, 438 (5th Cir.1993).

**30.** *See Carmouche,* 10 S.W.3d at 331; *Allridge v. State,* 850 S.W.2d 471, 493 (Tex.Crim.App. 1991), *cert. denied,* 510 U.S. 831, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993).

**31.** *Royer,* 460 U.S. at 497, 103 S.Ct. at 1324; *Carmouche,* 10 S.W.3d at 331.

**32.** *See Ohio v. Robinette,* 519 U.S. 33, 40, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996); *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973); *Reasor,* 12 S.W.3d at 818.

**33.** *See Carmouche,* 10 S.W.3d at 331; *Allridge,* 850 S.W.2d at 493.

**34.** *See Segura v. United States,* 468 U.S. 796, 804, 104 S.Ct. 3380, 3385, 82 L.Ed.2d 599 (1984).

SUE WALKER, Justice, dissenting on rehearing en banc.

I respectfully dissent. The general rule is that an investigative stop can last no longer than necessary to effect the purpose of the stop. *Kothe v. State,* 152 S.W.3d 54, 63 (Tex.Crim.App.2004). Once an officer concludes the investigation of the conduct that initiated the stop, continued detention of a person is permitted only if there is reasonable suspicion to believe another offense has been or is being committed. *Davis v. State,* 947 S.W.2d 240, 244 (Tex.Crim.App.1997). To establish reasonable suspicion justifying a continued detention, an officer must be able to articulate something more than an inchoate and unparticularized suspicion or hunch. *See United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989).

In other words, if a driver is stopped on suspicion of driving while intoxicated, once the police officer determines that the driver is not impaired and completes routine traffic stop duties—such as checking the driver's license and car registration and running a computer check on that information—the driver should be promptly released. *Kothe,* 152 S.W.3d at 63–64. At this point, the traffic-stop investigation is fully resolved; the detention must end and the driver must be permitted to leave. *Id.; Herrera v. State,* 80 S.W.3d 283, 289 (Tex.App.-Texarkana 2002, pet. ref'd). An investigative detention must be temporary, must last no longer than is necessary to effectuate the purpose of the stop, and cannot be utilized as a "fishing expedition" concerning unrelated criminal activity. *See Davis,* 947 S.W.2d at 243 (quoting *Ohio v. Robinette,* 519 U.S. 33, 41, 117 S.Ct. 417, 422, 136 L.Ed.2d 347 (1996) (Ginsburg, J., concurring)); *see also Terry v. Ohio,* 392 U.S. 1, 18, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968) (stating that scope of search must be limited because "a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope"). "A stop based on a violation of a traffic regulation will not justify detention to await the arrival of a drug detection dog ... [which] is necessarily a greater imposition on a motorist than conducting a search immediately upon the arousal of a reasonable suspicion." *$217,590.00 In U.S. Currency v. State,* 54 S.W.3d 918, 924 (Tex.App.-Corpus Christi 2001, no pet.).

Texas Department of Public Safety troopers stopped Appellant Mikel Wayne Lambeth, Jr. The entire stop was recorded on a videotape that was introduced into evidence at the suppression hearing and is part of our record. Trooper Randall Wilson testified that the videotape truly and accurately depicts the stop.

The videotape shows the troopers stop Lambeth for speeding. During the next twenty-four minutes the troopers talk with Lambeth, ask Lambeth where he is going and request permission to search the vehicle, conduct field sobriety tests on Lambeth (all of which he passes), conduct a pat down search of Lambeth (which uncovers nothing), obtain the information they need to run computer checks on Lambeth and on the vehicle, and to write Lambeth citations. At this point in time the troopers had concluded their investigation of the speeding offense and of all other possible offenses that they reasonably suspected Lambeth may have committed—those being driving with an expired license, with no registration sticker, and while intoxicated. The troopers' reasonable suspicions had been fully resolved; at this point the troopers should have written any necessary citations to Lambeth, Lambeth's detention should have ended, and he should have been permitted to leave. *See Kothe,* 152 S.W.3d at 63–64.

Although both troopers testified at the suppression hearing, neither of them was

able to articulate any facts they possessed *at this point* in the stop that would give rise to any suspicion that Lambeth had been or might be engaging in some other criminal activity. They both testified only that they were suspicious because Lambeth was nervous and "slightly evasive in his answers," but they both agreed that nervousness during a traffic stop was not uncommon. In short, at this point in the stop the troopers possessed nothing more than an inchoate and unparticularized suspicion or hunch that "something" might be in Lambeth's car because he was nervous and had repeatedly declined to give them consent to search the car. Nonetheless, Trooper Wilson decided to continue Lambeth's detention; he called dispatch and requested Canine Officer Robert Young be sent to the scene, stating, "We need a dog to run on a vehicle."

The troopers then continued to detain Lambeth to wait for the arrival of the canine unit to conduct a "free air" search of the vehicle. It was during this continued detention that Trooper Hatfield said he smelled marijuana on Lambeth. The majority claims that while waiting for a canine unit the troopers continued to ask legitimate questions related to matters within the scope of the traffic stop, including whether he had outstanding warrants, where he was going, why his vehicle was not registered, and who owned the vehicle. The problem with the majority's position is that the video tape of the stop establishes that these questions had already been asked and answered.[1] We cannot agree with the majority that the repetitive questioning of Lambeth may justify his subsequent continued detention to await a canine unit.

Lambeth's continued detention to await the arrival of a canine unit after the completion of the traffic stop investigation and after the completion of the investigations into the troopers' other reasonable suspicions—that Lambeth was driving with an expired license, had no registration sticker, and was driving while intoxicated—violated his Fourth Amendment rights. *See Kothe*, 152 S.W.3d at 63–64; *Davis*, 947 S.W.2d at 244–45. When Trooper Hatfield said he smelled marijuana—approximately twenty-four minutes after the troopers stopped Lambeth for speeding, after the troopers had completed their investigation of all possible offenses they reasonably believed Lambeth could have been committing, after the troopers had obtained all the information they needed to write Lambeth citations, and after Trooper Wilson had called for a canine unit—the stop should have already been concluded and citations should have already been issued. Because Lambeth's detention should have ended prior to the point in time when Trooper Hatfield said that he smelled marijuana on Lambeth, this fact cannot retroactively justify Lambeth's unauthorized, continued detention. *See Davis*, 947 S.W.2d at 244–45; *$217,590.00 In U.S. Currency*, 54 S.W.3d at 924 (explaining that traffic stop will not justify continued detention to await the arrival of a drug detection dog). *Cf. Coleman v. State*, 188 S.W.3d 708, 719 (Tex.App.-Tyler 2005, pet. ref'd) (holding officer's articulated reasonable suspicion justified appellant's contin-

1. For example, one minute into the stop, before Lambeth had even exited the vehicle Trooper Wilson states, "You don't have it [the vehicle] registered? ... "Why is it not registered?" Lambeth states, "Here is the title." Two minutes into the stop, Trooper Wilson can then be heard calling in Lambeth's license plate. And eight minutes into the stop dispatch can be heard providing the requested information back to Trooper Wilson. And after the canine unit had been called Trooper Wilson asks Lambeth what his address is. But the video tape shows Trooper Wilson asking for and writing down Lambeth's address on a form on his clipboard approximately eleven minutes into the stop.

ued detention to await canine unit when officer suspected appellant of drug trafficking based on appellant's prior arrests for drug offenses, appellant's lie about his prior criminal history, and appellant's possession of small jeweler's bags used in cocaine trafficking), *cert. denied,* —— U.S. ——, 127 S.Ct. 502, 166 L.Ed.2d 376 (2006).

I would sustain Lambeth's first issue and hold that the trial court abused its discretion by misapplying the law to the undisputed facts reflected in the videotape and confirmed by the troopers' testimony. *See McQuarters v. State,* 58 S.W.3d 250, 258 (Tex.App.-Fort Worth 2001, pet. ref'd) (reversing trial court's denial of motion to suppress and holding officer did not have reasonable suspicion to detain defendant after traffic stop for canine search). Because the majority does not, I dissent.

LIVINGSTON and DAUPHINOT, JJ., joined.