Opinion filed September 10, 2009











 
 
  
 
 







 
 
  
 
 




Opinion filed September
10, 2009

 

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                  ___________

 

                                                          No. 11-08-00214-CR

                                                    __________

 

                            DEMETRICE WAYNE PARKER, Appellant

 

                                                             V.

 

                                        STATE
OF TEXAS, Appellee

 



 

                                          On
Appeal from the 32nd District Court

 

                                                          Nolan
County, Texas

 

                                                    Trial
Court Cause No. 10685

 



 

                                                                   O
P I N I O N

Demetrice
Wayne Parker appeals his conviction for the first degree felony offense of
possession of 400 grams or more of cocaine with the intent to deliver. 
Appellant pleaded nolo contendere to the offense after the trial court denied
his motion to suppress evidence.  Pursuant to a plea bargain agreement, the
trial court sentenced appellant to twenty years confinement and a fine of
$1,000.  In his sole appellate issue, appellant contends that the trial court
erred in denying his motion to suppress because police officers discovered the
cocaine as a result of illegally detaining him after a traffic stop.  We
affirm.








                                                                    Introduction

On
August 22, 2007, appellant was a passenger in a vehicle being driven by Thomas
Pimpton.  On that date, at 12:32 p.m., Department of Public Safety Trooper Todd
Adkins stopped Pimpton for speeding.  After conducting an investigation,
Trooper Adkins arranged for a drug dog to be brought to the scene for the
purpose of performing a free-air sniff around the stopped vehicle. Department
of Public Safety Trooper Ben Mueller, the canine officer, arrived at the scene
with the drug dog at 1:50 p.m.  The drug dog alerted on the vehicle at 1:54
p.m., and, thereafter, law officers found cocaine in the trunk of the vehicle. 
This appeal involves two primary issues:  (1) whether Trooper Adkins had
reasonable suspicion to detain appellant and (2) if so, whether the duration of
appellant=s detention
was reasonable.          

                                                                    Background

Trooper
Adkins and Trooper Mueller testified at the suppression hearing.  Trooper
Adkins testified that, on August 22, 2007, at 12:32 p.m., he stopped Pimpton
for a speeding violation on Interstate 20 at about mile marker 232.  At that
time, Pimpton was driving a white Dodge Magnum. Appellant was in the front
passenger seat of the vehicle, and a juvenile was in the backseat of the
vehicle.  Trooper Adkins testified that Pimpton was going 76 miles per hour
before the stop.  The stop was videotaped by a camera in Trooper Adkins=s vehicle, and the State
introduced into evidence a copy of the video, which also contained audio, at
the suppression hearing.  The relevant part of the video was played for the
trial court.[1]








After
stopping the vehicle, Trooper Adkins approached the driver=s side of the vehicle.  He
requested to see Pimpton=s
driver=s license. 
Pimpton complied with Trooper Adkins=s
request.  However, the manner in which Pimpton produced his license raised
suspicion in Trooper Adkins=s
mind.  Trooper Adkins testified that Pimpton had a Alarge bulge@
in his front pants pocket, which Trooper Adkins believed was Pimpton=s wallet.  Trooper Adkins
said that, instead of pulling the bulge out of his pocket, Pimpton Astuffed his hand in there,
sat back in his seat, [and] thumbed around to get his license out as if he was
trying to hide something in his front pocket from me.@  Trooper Adkins testified that, when he was
talking with Pimpton, appellant was eating a hamburger. Trooper Adkins said
that appellant continued to eat the hamburger Ainstead
of actually putting it down like most people would have and paying attention to
what was going on at the time.@ 
Appellant provided an identification card to Trooper Adkins.

The
Dodge Magnum was a rental vehicle.  Pimpton told Trooper Adkins that the
vehicle had been rented in Abilene by his girlfriend, Tonya Carr.  Trooper
Adkins asked Pimpton for the rental agreement for the vehicle.  Pimpton and
appellant were unable to find the rental agreement in the vehicle.  At 12:35
p.m., Pimpton got out of the vehicle at Trooper Adkins=s request.[2] 
Trooper Adkins and Pimpton walked toward the rear of the Dodge Magnum.  Trooper
Adkins asked Pimpton, A[W]here
y=all coming from?@  Pimpton responded that
they had come from California.  When asked by Trooper Adkins how long they had
been in California, Pimpton responded, A[T]hree
days.@

            At
12:35:50 p.m., Trooper Adkins approached appellant to ask him whether he had
found the rental agreement.  Appellant was not looking for the rental agreement
but was still eating his hamburger.  Trooper Adkins believed that, by
continuing to eat the hamburger, appellant was attempting to avoid speaking
with him.  Trooper Adkins thought that appellant may have been trying to hide
something from him.  Trooper Adkins testified that, based on other stops he had
made, appellant=s
conduct was indicative Aof
a passenger in the vehicle not wanting to speak to me.@  Appellant did not find the rental
agreement.  In response to questioning by Trooper Adkins, appellant said that
he and Pimpton had been in California for five days.  Thus, appellant and
Pimpton gave conflicting statements about the length of the trip.








            At
12:37:25 p.m., Pimpton recalled that the rental agreement might be in the
trunk.  At 12:37:43 p.m., appellant unlocked the trunk from inside the
vehicle.  Trooper Adkins walked to the back of the vehicle.  At that time,
Trooper Adkins looked through the back windows of the vehicle for luggage, and
he saw that the vehicle did not contain the amount of luggage that would have
been necessary for a three-day or five-day trip to California.  The lack of
luggage was significant to Trooper Adkins because he was aware of cases
involving seizures of large amounts of narcotics and currency where Anot a lot of luggage@ had been taken.  Pimpton
lifted the hatchback, retrieved paperwork from the trunk area, and then
immediately closed the hatchback.  Before Pimpton closed the hatchback, Trooper
Adkins saw a box of ATide
soap@ inside the
trunk.  Trooper Adkins testified that, in the past, he had seen ATide soap or soap boxes
being used to contain illegal narcotics trying to mask the odors that the
narcotic would put off.@

            At
12:38:15 p.m., Pimpton located a rental agreement in the paperwork that he had
retrieved from the trunk.  He handed the rental agreement to Trooper Adkins. 
Trooper Adkins then asked Pimpton, A[W]ho
rented it?@  In
response, appellant told Trooper Adkins that his Agirlfriend
did.@ Pimpton put the
other paperwork back in the trunk.  At 12:38:50 p.m., Trooper Adkins told
Pimpton that he was going to his vehicle to look at the rental agreement. 
Trooper Adkins also told Pimpton that he would be receiving a warning on the
speeding, with no fine or penalty, and Aif
you=ll hold on tight
just a second, I=ll be
right with you.@

By
12:39:00 p.m., Trooper Adkins had decided that he was going to ask for consent
to search the vehicle.  At that time, Trooper Adkins believed that he had
sufficient articulable facts that gave him reasonable suspicion to detain the occupants
of the vehicle.  When he returned to his vehicle, Trooper Adkins requested
warrant and criminal history information for Pimpton and appellant over his
radio.  At 12:40:00 p.m., while waiting for the warrant and criminal history
information, Trooper Adkins stated a number of observations into his
microphone, including the following: (1) that appellant was acting Areal hesitant@; (2) that Athey say they=re coming from California@; (3) that they were in a
third party rental vehicle; (4) that Pimpton said his girlfriend rented the
vehicle; (5) that Athey
don=t have hardly any
clothes in the vehicle B
said they=d been there
a week@; and (6) that
appellant was Areal
nervous B shaking B his hands [were] shaking
real bad.@








At
12:41 p.m., Trooper Adkins received the requested warrant information.  Neither
Pimpton nor appellant had any outstanding warrants.  However, they both had
lengthy criminal histories, including arrests for a number of drug offenses. 
The dispatcher gave Trooper Adkins the following criminal history for Pimpton: 
A1991 B one traffic offense; 1992 B one possession of cocaine;
[audio interrupted] . . . manufacture, deliver, possess controlled substance;
2002 B two possession
of marihuana; one possession of a controlled substance; [and] one evading
arrest.@  The
dispatcher gave Trooper Adkins the following criminal history for appellant: Aone theft of property; one
possession of marihuana under two ounces; two possession of marihuana under five
pounds; one possession of a controlled substance over one gram; [and] one
carrying prohibited weapon.@ 
After receiving the criminal histories, at 12:44:10 p.m., Trooper Adkins
requested backup over his radio.  Department of Public Safety Trooper Bill
Wheat responded to the request.

In
reviewing the rental agreement, Trooper Adkins noticed that Pimpton was not
named in it.  The rental agreement indicated that Tonya Carr had rented the
vehicle.  The fact that Carr was not in the vehicle was significant to Trooper
Adkins because he had made other stops involving third party rental vehicles
that Aha[d] yielded
large amounts of narcotics or illegal drug money.@ 
At 12:45:09 p.m., Trooper Adkins exited his vehicle and then questioned Pimpton
as to whether he was supposed to be driving the vehicle.

At
12:48:15 p.m., Trooper Adkins requested consent from Pimpton to search the
vehicle. Pimpton denied consent to search.  Trooper Adkins believed that he had
sufficient articulable facts, including Pimpton=s
and appellant=s
criminal histories, to justify detaining Pimpton and appellant and waiting on
the arrival of a drug dog.  Trooper Adkins explained to Pimpton that he was
going to arrange for a drug dog to be brought to the scene for the purpose of
performing a free-air search around the vehicle.  Trooper Adkins searched
Pimpton and appellant for weapons.  He did not find any weapons or contraband
during the searches.  Trooper Wheat arrived at the scene, and
Trooper Adkins apprised him of the situation.

At
12:51 p.m., Trooper Adkins returned to his vehicle and attempted to locate an
available canine officer.  The video shows that, from 12:53 p.m. until 1:11
p.m., Trooper Adkins made numerous phone calls on the subject.  He determined
that the canine officer in Sweetwater was unavailable.  At one point, Trooper
Adkins thought that he would have to let Pimpton and appellant go because he
had been unable to find a canine officer.  However, at 1:10:40 p.m., Trooper
Adkins located Ben Mueller, who was a canine officer in Big Spring.  At the
time of Trooper Adkins=s
call, Trooper Mueller was about thirty or forty minutes away from the scene. 
Trooper Mueller agreed to drive to the scene to assist Trooper Adkins.

Trooper
Wheat discovered that the rental agreement Pimpton had provided to
Trooper Adkins was for Aa
red Ford Fusion.@ 
While waiting for Trooper Mueller to arrive, Trooper Adkins contacted Avis
to determine whether Pimpton was authorized to drive the Dodge Magnum. The manager
at Avis told Trooper Adkins that Pimpton was not allowed to drive the
vehicle.             








At
1:50 p.m., Trooper Mueller arrived at the scene with his drug dog.  Trooper
Mueller testified that his dog was trained to alert on cocaine, heroin, methamphetamine,
and marihuana.  At 1:54 p.m., Trooper Mueller=s
dog performed a free-air sniff around the Dodge Magnum. Trooper Mueller
testified in detail about the results of the free-air sniff.  He said that his
dog alerted to the driver=s
side of the vehicle near the bottom of the door, the driver and passenger
doors, and the back wheel well of the driver=s
side of the vehicle.  Trooper Adkins testified that the dog=s alert on the vehicle gave
the troopers probable cause to search the vehicle without consent.  The
troopers searched the vehicle, and they found a large bag of powdered cocaine
in the Tide box that was in the trunk of the vehicle.  They also found about
$16,000 in the vehicle.

After
the evidence was concluded, the trial court denied appellant=s motion to suppress.  The
trial court entered findings of fact and conclusions of law in support of its
ruling.  The trial court concluded, in relevant part, as follows:

1.  The traffic stop
for speeding was reasonable and lawful. 

 

2.  The continued
detention during which Trooper Adkins checked on the status of the vehicle was
reasonable and lawful.  The time elapsed before the canine unit arrived at the
scene was reasonable and lawful.  When the canine unit alerted on the vehicle,
it gave Trooper Adkins probable cause to conduct a search of the vehicle.

 

On
appeal, appellant contends that the troopers found the cocaine as a result of
unlawfully detaining him in violation of the Fourth and Fourteenth Amendments
to the United States Constitution and Article I, section 9, of the Texas
Constitution.  See U.S. Const.
amends. IV, XIV; Tex. Const. art.
I, ' 9.  Appellant
states in his brief that A[t]he
narcotics in question were the fruit of an illegal detention@ and that A[he] was detained for an
absurd length of time without reasonable suspicion.@  Therefore, appellant asserts that the trial
court abused its discretion in denying his motion to suppress.

                                                              Standard
of Review








A
trial court=s denial
of a motion to suppress is reviewed for an abuse of discretion.  Balentine
v. State, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002).  In reviewing a trial
court=s ruling on a
motion to suppress, an appellate court must view the evidence in the light most
favorable to the trial court=s
ruling.  State v. Kelly, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006).  We
give great deference to the trial court=s
findings of historical facts, but we review de novo the trial court=s application of the law.  Wiede
v. State, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007).

                                                                  Applicable
Law

A
traffic stop is a detention and must be reasonable under the United States and
Texas Constitutions.  Davis v. State, 947 S.W.2d 240, 245 (Tex. Crim.
App. 1997); Spight v. State, 76 S.W.3d 761, 766 (Tex. App.CHouston [1st Dist.] 2002,
no pet.).  To be reasonable, a traffic stop must be temporary and last no
longer than is necessary to effectuate the purpose of the stop.  Florida v.
Royer, 460 U.S. 491, 500 (1983); Davis, 947 S.W.2d at 245. 
Reasonableness is measured in objective terms by examining the totality of the
circumstances.  Ohio v. Robinette, 519 U.S. 33, 39 (1996); Spight,
76 S.W.3d at 765.  

During
a traffic stop, an officer has the right to ask the driver for identification,
a valid driver=s
license, information concerning ownership of the vehicle, proof of insurance,
and information concerning the destination and purpose of the trip.  Kothe
v. State, 152 S.W.3d 54, 63 (Tex. Crim. App. 2004); Davis, 947
S.W.2d at 245 n.6; Caraway v. State, 255 S.W.3d 302, 307 (Tex. App.CEastland 2008, no pet.); Lambeth
v. State, 221 S.W.3d 831, 836 (Tex. App.CFort Worth
2007, pet. ref=d). 
The officer may also approach the passengers in the vehicle and ask them
similar questions.  Duff v. State, 546 S.W.2d 283, 286 (Tex. Crim. App.
1977); Freeman v. State, 62 S.W.3d 883, 887-88 (Tex. App.CTexarkana 2001, pet. ref=d).  The officer may also
check for outstanding warrants.  Kothe, 152 S.W.3d at 63; Caraway,
255 S.W.3d at 308.  While the officer is awaiting a computer warrant check,
questioning about matters unrelated to the initial traffic stop does not
violate the Fourth Amendment because such questioning does not extend the
duration of an initial valid stop.  Willis v. State, 192 S.W.3d 585, 591
(Tex. App.CTyler 2006,
pet. ref=d).  An
officer making a traffic stop is not required to investigate the situation in a
particular order.  Kothe, 152 S.W.3d at 65.  For example, no per se rule
exists that requires Aan
officer immediately to obtain the driver=s
license and registration information and initiate the relevant background
checks before asking questions.@ 
United States v. Brigham, 382 F.3d 500, 511 (5th Cir. 2004).  Only if
the investigation Aunduly
prolongs@ the
detention is the officer=s
action unreasonable under the circumstances.  Kothe, 152 S.W.3d at 65.








When
the reason for the stop has been satisfied, the stop may not be used as a Afishing expedition@ for unrelated criminal
activity.  Davis, 947 S.W.2d at 243 (quoting Robinette, 519 U.S.
at 41 (Ginsburg, J., concurring)).  Once an officer concludes the investigation
of the conduct that initiated the stop, continued detention of a person is
permitted only if there is reasonable suspicion to believe that the person is
violating the law.  Ford v. State, 158 S.W.3d 488, 492 (Tex. Crim. App.
2005); Davis, 947 S.W.2d at 245.  Reasonable suspicion exists if the
officer has specific, articulable facts that, when combined with rational
inferences from those facts, would lead him to conclude that a particular
person actually is, has been, or soon will be engaged in criminal activity.  Castro
v. State, 227 S.W.3d 737, 741 (Tex. Crim. App. 2007); Ford, 158
S.W.3d at 492.  This is an objective standard that disregards any subjective
intent of the officer making the stop and looks solely to whether an objective
basis for the stop exists.  Ford, 158 S.W.3d at 492.  Whether the
totality of the circumstances is sufficient to support an officer=s reasonable suspicion is a
question of law that we review de novo.  Madden v. State, 242 S.W.3d
504, 517 (Tex. Crim. App. 2007).

A
detention based on reasonable suspicion must be temporary and last no longer
than is necessary to effectuate the purpose of the stop.  Royer, 460
U.S. at 500.  Although the length of a detention may render a traffic stop
unreasonable, there is no rigid, bright-line time limitation.  United States
v. Sharpe, 470 U.S. 675, 685 (1985); Love v. State, 252 S.W.3d 684,
687 (Tex. App.CTexarkana
2008, pet. ref=d); Belcher
v. State, 244 S.W.3d 531, 539 (Tex. App.CFort
Worth 2007, no pet.).  Instead, common sense and ordinary human experience must
govern over rigid criteria.  Sharpe, 470 U.S. at 685; Love, 252
S.W.3d at 687; Belcher, 244 S.W.3d at 539.  The reasonableness of the
duration of a detention depends on whether the police diligently pursued a
means of investigation that was likely to confirm or dispel any suspicions
quickly, during which time it was necessary to detain the defendant.  Sharpe,
470 U.S. at 686; Love, 252 S.W.3d at 687; Belcher, 244 S.W.3d at
539.

                                                        Application
of Law to Facts








Appellant
does not challenge the legality of the original traffic stop for speeding.  He
focuses on two periods of time in his brief: 12:44 p.m. to 1:03 p.m. and 1:03
p.m. to 1:50 p.m.  He argues that detaining him during both of these periods of
time was Apatently
unreasonable.@ 
Appellant apparently contends that the purpose of the original stop was
satisfied at 12:43:18 p.m. after Trooper Adkins discovered that neither he
nor Pimpton had outstanding warrants and that, at that time, Trooper Adkins did
not have reasonable suspicion to further detain him.  Therefore, he contends
that his detention after 12:44 p.m. was unlawful.  The troopers discovered that
the rental agreement was for the red Ford Fusion at 1:03 p.m.  Appellant
contends that this discovery did not give rise to reasonable suspicion to
detain him and that, even if it had, the State cannot justify the earlier
detention from 12:44 p.m. to 1:03 p.m.  The State argues that Trooper Adkins
had reasonable suspicion to detain appellant and that the duration of appellant=s detention was reasonable.

We
first address whether Trooper Adkins had reasonable suspicion to detain
appellant.  The stop occurred at 12:32 p.m.  Trooper Adkins acted reasonably in
approaching Pimpton and appellant and asking them for identification,
information about the ownership of the vehicle, and information about their
trip.  Davis, 947 S.W.2d at 245 n.6; Caraway, 255 S.W.3d at 307; Lambeth,
221 S.W.3d at 836; Freeman, 62 S.W.3d at 887-88.  He also acted
reasonably in checking for outstanding warrants and criminal histories.  Kothe,
152 S.W.3d at 63.  Within about ten minutes after the stop, Trooper Adkins
learned the criminal history information.  Thus, the record shows that Trooper
Adkins conducted his investigation of the speeding violation in a diligent and
timely fashion.

Based
on his investigation of the traffic offense, Trooper Adkins discovered a number
of facts that led him to suspect that Pimpton and appellant were transporting
narcotics.  During his testimony, Trooper Adkins identified a number of facts
that raised suspicions in his mind:  (1) testimony, Pimpton did not take
his wallet out of his pocket when he retrieved his license; (2) appellant
continued to eat his hamburger; (3) Pimpton and appellant made conflicting
statements about the length of their California trip; (4) the lack of luggage
in the vehicle; (5) the vehicle was a third party rental vehicle; (6) the Tide
soap box in the trunk of the vehicle; and (7) Pimpton=s and appellant=s
criminal histories.  In addition, at 12:40 p.m., Trooper Adkins stated into his
microphone that appellant was acting really nervous and that his hands were
shaking really bad.








Viewed
in isolation, some of the above facts might not support a reasonable suspicion
finding.  However, conduct that may be innocent when viewed in isolation may
give rise to reasonable suspicion when viewed in the light of the totality of
the circumstances.  Woods v. State, 956 S.W.2d 33, 38 (Tex. Crim. App.
1997).  Based on his experience, Trooper Adkins knew that rental vehicles are
used to traffic narcotics; that detergents are used to mask the odor of
narcotics; and that, in cases involving seizures of large amounts of narcotics
and currency, Anot a
lot of luggage is taken.@ 
Appellant=s and
Pimpton=s lengthy
criminal histories included numerous drug offenses.  The criminal histories,
when combined with the other facts, provided strong support for
Trooper Adkins=s
conclusion that he had reasonable suspicion to detain Pimpton and appellant. 
Based on the totality of the circumstances, we conclude that Trooper Adkins
possessed specific, articulable facts that, when combined with rational
inferences from those facts, would lead him to reasonably conclude that
appellant was engaging in criminal activity and that, therefore, Trooper Adkins
had reasonable suspicion to detain him.

Appellant
relies on the following cases to support his contention that Trooper Adkins did
not have reasonable suspicion to detain him:  Herrera v. State, 80
S.W.3d 283 (Tex. App.CTexarkana
2002, pet. ref=d); McQuarters
v. State, 58 S.W.3d 250 (Tex. App.CFort
Worth 2001, pet. ref=d);
and Veal v. State, 28 S.W.3d 832 (Tex. App.CBeaumont 2000, pet. ref=d).[3]  The nature
of the specific, articulable facts that were known to Trooper Adkins in this
case distinguishes it from the cases cited by appellant.  For example, there
was no evidence in the cases cited by appellant that the detainees had lengthy
criminal histories that included arrests for drug offenses. 








We
now address whether the duration of appellant=s
detention was reasonable.  The drug dog alerted on the vehicle about seventy
minutes after Trooper Adkins discovered the criminal histories. A
seventy-minute detention is not unreasonable per se.  Strauss v. State,
121 S.W.3d 486, 492 (Tex. App.CAmarillo
2003, pet. ref=d) (A
seventy-five-minute detention from the stop until the drug dog arrived was not
unreasonable.); Josey v. State, 981 S.W.2d 831, 840-41 (Tex. App.CHouston [14th Dist.] 1998,
pet. ref=d) (A
ninety-minute detention from the stop until the officers searched the vehicle
was not unreasonable.).  Rather, the reasonableness of the duration of
appellant=s detention
depends on whether Trooper Adkins diligently pursued a means of investigation
that was likely to confirm or dispel his suspicions quickly.  Sharpe,
470 U.S. at 686.  A free-air sniff by a trained drug dog is recognized as a
minimally intrusive method of investigation for an officer to confirm or dispel
his suspicions of the presence of narcotics.  See Strauss, 121 S.W.3d at
492; Josey, 981 S.W.2d at 841.

After
Pimpton denied consent to search the vehicle, Trooper Adkins returned to his
vehicle and attempted to locate an available canine officer.  Trooper Adkins
made numerous phone calls over an eighteen-minute period in an attempt to find
a canine officer.  He determined that the canine officer in Sweetwater was
unavailable.  At 1:10:40 p.m., he called Trooper Mueller, and Trooper Mueller
agreed to assist him.  At the time, Trooper Mueller was thirty or forty minutes
away from the scene.  Trooper Mueller arrived with his drug dog at the scene at
1:50 p.m.  When the drug dog arrived at the scene, it quickly confirmed Trooper
Adkins=s suspicions. 
The drug dog alerted on the vehicle within three or four minutes after arriving
at the scene.  Once the drug dog alerted on the vehicle, Trooper Adkins=s reasonable suspicion
ripened into probable cause to search the vehicle.  Harrison v. State, 7
S.W.3d 309, 311 (Tex. App.CHouston
[1st Dist.] 1999, pet. ref=d);
Josey, 981 S.W.2d at 846; Ortiz v State, 930 S.W.2d 849, 856
(Tex. App.CTyler 1996,
no pet.).  We conclude that Trooper Adkins diligently pursued a means of
investigation that was likely to confirm or dispel his suspicions quickly and
that, therefore, the duration of appellant=s
detention was reasonable.  See Love, 252 S.W.3d at 688.    

Because
Trooper Adkins had reasonable suspicion to detain appellant and because the
duration of appellant=s
detention was reasonable, the trial court did not abuse its discretion in
denying appellant=s
motion to suppress.  We overrule appellant=s
sole issue.

                                                               This
Court=s Ruling

We
affirm the judgment of the trial court.

 

 

TERRY McCALL

JUSTICE 

 

September 10,
2009

Publish.  See
Tex. R. App. P. 47.2(b).

Panel consists of:  Wright, C.J.,

McCall, J., and Strange, J.









[1]The tracking is bad through most of the video, and
there are also occasional audio problems.





[2]The times referenced in this opinion are approximate
times as shown in the video.  





[3]Appellant also relies on Parker v. State, 182
S.W.3d 923 (Tex. Crim. App. 2006).  However, the issue in Parker was
whether the defendant had standing to contest a search of a vehicle.  The court
did not address whether the officer had reasonable suspicion to detain the
defendant.