**Opinion filed September 10, 2009**



In The

# Eleventh Court of Appeals

_____

## No. 11-08-00214-CR

_____

## DEMETRICE WAYNE PARKER, Appellant

## V.

## STATE OF TEXAS, Appellee

**On Appeal from the 32nd District Court**

**Nolan County, Texas**

**Trial Court Cause No. 10685**

**O P I N I O N**

Demetrice Wayne Parker appeals his conviction for the first degree felony offense of possession of 400 grams or more of cocaine with the intent to deliver. Appellant pleaded nolo contendere to the offense after the trial court denied his motion to suppress evidence. Pursuant to a plea bargain agreement, the trial court sentenced appellant to twenty years confinement and a fine of $1,000. In his sole appellate issue, appellant contends that the trial court erred in denying his motion to suppress because police officers discovered the cocaine as a result of illegally detaining him after a traffic stop. We affirm.

*Introduction*

On August 22, 2007, appellant was a passenger in a vehicle being driven by Thomas Pimpton. On that date, at 12:32 p.m., Department of Public Safety Trooper Todd Adkins stopped Pimpton for speeding. After conducting an investigation, Trooper Adkins arranged for a drug dog to be brought to the scene for the purpose of performing a free-air sniff around the stopped vehicle. Department of Public Safety Trooper Ben Mueller, the canine officer, arrived at the scene with the drug dog at 1:50 p.m. The drug dog alerted on the vehicle at 1:54 p.m., and, thereafter, law officers found cocaine in the trunk of the vehicle. This appeal involves two primary issues: (1) whether Trooper Adkins had reasonable suspicion to detain appellant and (2) if so, whether the duration of appellant's detention was reasonable.

*Background*

Trooper Adkins and Trooper Mueller testified at the suppression hearing. Trooper Adkins testified that, on August 22, 2007, at 12:32 p.m., he stopped Pimpton for a speeding violation on Interstate 20 at about mile marker 232. At that time, Pimpton was driving a white Dodge Magnum. Appellant was in the front passenger seat of the vehicle, and a juvenile was in the backseat of the vehicle. Trooper Adkins testified that Pimpton was going 76 miles per hour before the stop. The stop was videotaped by a camera in Trooper Adkins's vehicle, and the State introduced into evidence a copy of the video, which also contained audio, at the suppression hearing. The relevant part of the video was played for the trial court.[1]

After stopping the vehicle, Trooper Adkins approached the driver's side of the vehicle. He requested to see Pimpton's driver's license. Pimpton complied with Trooper Adkins's request. However, the manner in which Pimpton produced his license raised suspicion in Trooper Adkins's mind. Trooper Adkins testified that Pimpton had a "large bulge" in his front pants pocket, which Trooper Adkins believed was Pimpton's wallet. Trooper Adkins said that, instead of pulling the bulge out of his pocket, Pimpton "stuffed his hand in there, sat back in his seat, [and] thumbed around to get his license out as if he was trying to hide something in his front pocket from me." Trooper Adkins testified that, when he was talking with Pimpton, appellant was eating a hamburger.

---

[1]The tracking is bad through most of the video, and there are also occasional audio problems.

Trooper Adkins said that appellant continued to eat the hamburger "instead of actually putting it down like most people would have and paying attention to what was going on at the time." Appellant provided an identification card to Trooper Adkins.

The Dodge Magnum was a rental vehicle. Pimpton told Trooper Adkins that the vehicle had been rented in Abilene by his girlfriend, Tonya Carr. Trooper Adkins asked Pimpton for the rental agreement for the vehicle. Pimpton and appellant were unable to find the rental agreement in the vehicle. At 12:35 p.m., Pimpton got out of the vehicle at Trooper Adkins's request.[2] Trooper Adkins and Pimpton walked toward the rear of the Dodge Magnum. Trooper Adkins asked Pimpton, "[W]here y'all coming from?" Pimpton responded that they had come from California. When asked by Trooper Adkins how long they had been in California, Pimpton responded, "[T]hree days."

At 12:35:50 p.m., Trooper Adkins approached appellant to ask him whether he had found the rental agreement. Appellant was not looking for the rental agreement but was still eating his hamburger. Trooper Adkins believed that, by continuing to eat the hamburger, appellant was attempting to avoid speaking with him. Trooper Adkins thought that appellant may have been trying to hide something from him. Trooper Adkins testified that, based on other stops he had made, appellant's conduct was indicative "of a passenger in the vehicle not wanting to speak to me." Appellant did not find the rental agreement. In response to questioning by Trooper Adkins, appellant said that he and Pimpton had been in California for five days. Thus, appellant and Pimpton gave conflicting statements about the length of the trip.

At 12:37:25 p.m., Pimpton recalled that the rental agreement might be in the trunk. At 12:37:43 p.m., appellant unlocked the trunk from inside the vehicle. Trooper Adkins walked to the back of the vehicle. At that time, Trooper Adkins looked through the back windows of the vehicle for luggage, and he saw that the vehicle did not contain the amount of luggage that would have been necessary for a three-day or five-day trip to California. The lack of luggage was significant to Trooper Adkins because he was aware of cases involving seizures of large amounts of narcotics and currency where "not a lot of luggage" had been taken. Pimpton lifted the hatchback, retrieved paperwork from the trunk area, and then immediately closed the hatchback. Before Pimpton closed

---

[2]The times referenced in this opinion are approximate times as shown in the video.

the hatchback, Trooper Adkins saw a box of "Tide soap" inside the trunk. Trooper Adkins testified that, in the past, he had seen "Tide soap or soap boxes being used to contain illegal narcotics trying to mask the odors that the narcotic would put off."

At 12:38:15 p.m., Pimpton located a rental agreement in the paperwork that he had retrieved from the trunk. He handed the rental agreement to Trooper Adkins. Trooper Adkins then asked Pimpton, "[W]ho rented it?" In response, appellant told Trooper Adkins that his "girlfriend did." Pimpton put the other paperwork back in the trunk. At 12:38:50 p.m., Trooper Adkins told Pimpton that he was going to his vehicle to look at the rental agreement. Trooper Adkins also told Pimpton that he would be receiving a warning on the speeding, with no fine or penalty, and "if you'll hold on tight just a second, I'll be right with you."

By 12:39:00 p.m., Trooper Adkins had decided that he was going to ask for consent to search the vehicle. At that time, Trooper Adkins believed that he had sufficient articulable facts that gave him reasonable suspicion to detain the occupants of the vehicle. When he returned to his vehicle, Trooper Adkins requested warrant and criminal history information for Pimpton and appellant over his radio. At 12:40:00 p.m., while waiting for the warrant and criminal history information, Trooper Adkins stated a number of observations into his microphone, including the following: (1) that appellant was acting "real hesitant"; (2) that "they say they're coming from California"; (3) that they were in a third party rental vehicle; (4) that Pimpton said his girlfriend rented the vehicle; (5) that "they don't have hardly any clothes in the vehicle – said they'd been there a week"; and (6) that appellant was "real nervous – shaking – his hands [were] shaking real bad."

At 12:41 p.m., Trooper Adkins received the requested warrant information. Neither Pimpton nor appellant had any outstanding warrants. However, they both had lengthy criminal histories, including arrests for a number of drug offenses. The dispatcher gave Trooper Adkins the following criminal history for Pimpton: "1991 – one traffic offense; 1992 – one possession of cocaine; [audio interrupted] . . . manufacture, deliver, possess controlled substance; 2002 – two possession of marihuana; one possession of a controlled substance; [and] one evading arrest." The dispatcher gave Trooper Adkins the following criminal history for appellant: "one theft of property; one possession of marihuana under two ounces; two possession of marihuana under five pounds; one possession of a controlled substance over one gram; [and] one carrying prohibited weapon." After receiving the

4

criminal histories, at 12:44:10 p.m., Trooper Adkins requested backup over his radio. Department of Public Safety Trooper Bill Wheat responded to the request.

In reviewing the rental agreement, Trooper Adkins noticed that Pimpton was not named in it. The rental agreement indicated that Tonya Carr had rented the vehicle. The fact that Carr was not in the vehicle was significant to Trooper Adkins because he had made other stops involving third party rental vehicles that "ha[d] yielded large amounts of narcotics or illegal drug money." At 12:45:09 p.m., Trooper Adkins exited his vehicle and then questioned Pimpton as to whether he was supposed to be driving the vehicle.

At 12:48:15 p.m., Trooper Adkins requested consent from Pimpton to search the vehicle. Pimpton denied consent to search. Trooper Adkins believed that he had sufficient articulable facts, including Pimpton's and appellant's criminal histories, to justify detaining Pimpton and appellant and waiting on the arrival of a drug dog. Trooper Adkins explained to Pimpton that he was going to arrange for a drug dog to be brought to the scene for the purpose of performing a free-air search around the vehicle. Trooper Adkins searched Pimpton and appellant for weapons. He did not find any weapons or contraband during the searches. Trooper Wheat arrived at the scene, and Trooper Adkins apprised him of the situation.

At 12:51 p.m., Trooper Adkins returned to his vehicle and attempted to locate an available canine officer. The video shows that, from 12:53 p.m. until 1:11 p.m., Trooper Adkins made numerous phone calls on the subject. He determined that the canine officer in Sweetwater was unavailable. At one point, Trooper Adkins thought that he would have to let Pimpton and appellant go because he had been unable to find a canine officer. However, at 1:10:40 p.m., Trooper Adkins located Ben Mueller, who was a canine officer in Big Spring. At the time of Trooper Adkins's call, Trooper Mueller was about thirty or forty minutes away from the scene. Trooper Mueller agreed to drive to the scene to assist Trooper Adkins.

Trooper Wheat discovered that the rental agreement Pimpton had provided to Trooper Adkins was for "a red Ford Fusion." While waiting for Trooper Mueller to arrive, Trooper Adkins contacted Avis to determine whether Pimpton was authorized to drive the Dodge Magnum. The manager at Avis told Trooper Adkins that Pimpton was not allowed to drive the vehicle.

5

At 1:50 p.m., Trooper Mueller arrived at the scene with his drug dog. Trooper Mueller testified that his dog was trained to alert on cocaine, heroin, methamphetamine, and marihuana. At 1:54 p.m., Trooper Mueller's dog performed a free-air sniff around the Dodge Magnum. Trooper Mueller testified in detail about the results of the free-air sniff. He said that his dog alerted to the driver's side of the vehicle near the bottom of the door, the driver and passenger doors, and the back wheel well of the driver's side of the vehicle. Trooper Adkins testified that the dog's alert on the vehicle gave the troopers probable cause to search the vehicle without consent. The troopers searched the vehicle, and they found a large bag of powdered cocaine in the Tide box that was in the trunk of the vehicle. They also found about $16,000 in the vehicle.

After the evidence was concluded, the trial court denied appellant's motion to suppress. The trial court entered findings of fact and conclusions of law in support of its ruling. The trial court concluded, in relevant part, as follows:

1. The traffic stop for speeding was reasonable and lawful.

2. The continued detention during which Trooper Adkins checked on the status of the vehicle was reasonable and lawful. The time elapsed before the canine unit arrived at the scene was reasonable and lawful. When the canine unit alerted on the vehicle, it gave Trooper Adkins probable cause to conduct a search of the vehicle.

On appeal, appellant contends that the troopers found the cocaine as a result of unlawfully detaining him in violation of the Fourth and Fourteenth Amendments to the United States Constitution and Article I, section 9, of the Texas Constitution. *See* U.S. CONST. amends. IV, XIV; TEX. CONST. art. I, § 9. Appellant states in his brief that "[t]he narcotics in question were the fruit of an illegal detention" and that "[he] was detained for an absurd length of time without reasonable suspicion." Therefore, appellant asserts that the trial court abused its discretion in denying his motion to suppress.

*Standard of Review*

A trial court's denial of a motion to suppress is reviewed for an abuse of discretion. *Balentine v. State*, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002). In reviewing a trial court's ruling on a motion to suppress, an appellate court must view the evidence in the light most favorable to the trial court's ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). We give great

6

deference to the trial court's findings of historical facts, but we review de novo the trial court's application of the law. *Wiede v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007).

*Applicable Law*

A traffic stop is a detention and must be reasonable under the United States and Texas Constitutions. *Davis v. State*, 947 S.W.2d 240, 245 (Tex. Crim. App. 1997); *Spight v. State*, 76 S.W.3d 761, 766 (Tex. App.—Houston [1st Dist.] 2002, no pet.). To be reasonable, a traffic stop must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 500 (1983); *Davis*, 947 S.W.2d at 245. Reasonableness is measured in objective terms by examining the totality of the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 39 (1996); *Spight*, 76 S.W.3d at 765.

During a traffic stop, an officer has the right to ask the driver for identification, a valid driver's license, information concerning ownership of the vehicle, proof of insurance, and information concerning the destination and purpose of the trip. *Kothe v. State*, 152 S.W.3d 54, 63 (Tex. Crim. App. 2004); *Davis*, 947 S.W.2d at 245 n.6; *Caraway v. State*, 255 S.W.3d 302, 307 (Tex. App.—Eastland 2008, no pet.); *Lambeth v. State*, 221 S.W.3d 831, 836 (Tex. App.—Fort Worth 2007, pet. ref'd). The officer may also approach the passengers in the vehicle and ask them similar questions. *Duff v. State*, 546 S.W.2d 283, 286 (Tex. Crim. App. 1977); *Freeman v. State*, 62 S.W.3d 883, 887-88 (Tex. App.—Texarkana 2001, pet. ref'd). The officer may also check for outstanding warrants. *Kothe*, 152 S.W.3d at 63; *Caraway*, 255 S.W.3d at 308. While the officer is awaiting a computer warrant check, questioning about matters unrelated to the initial traffic stop does not violate the Fourth Amendment because such questioning does not extend the duration of an initial valid stop. *Willis v. State*, 192 S.W.3d 585, 591 (Tex. App.—Tyler 2006, pet. ref'd). An officer making a traffic stop is not required to investigate the situation in a particular order. *Kothe*, 152 S.W.3d at 65. For example, no per se rule exists that requires "an officer immediately to obtain the driver's license and registration information and initiate the relevant background checks before asking questions." *United States v. Brigham*, 382 F.3d 500, 511 (5th Cir. 2004). Only if the investigation "unduly prolongs" the detention is the officer's action unreasonable under the circumstances. *Kothe*, 152 S.W.3d at 65.

When the reason for the stop has been satisfied, the stop may not be used as a "fishing expedition" for unrelated criminal activity. *Davis*, 947 S.W.2d at 243 (quoting *Robinette*, 519 U.S. at 41 (Ginsburg, J., concurring)). Once an officer concludes the investigation of the conduct that initiated the stop, continued detention of a person is permitted only if there is reasonable suspicion to believe that the person is violating the law. *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005); *Davis*, 947 S.W.2d at 245. Reasonable suspicion exists if the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to conclude that a particular person actually is, has been, or soon will be engaged in criminal activity. *Castro v. State*, 227 S.W.3d 737, 741 (Tex. Crim. App. 2007); *Ford*, 158 S.W.3d at 492. This is an objective standard that disregards any subjective intent of the officer making the stop and looks solely to whether an objective basis for the stop exists. *Ford*, 158 S.W.3d at 492. Whether the totality of the circumstances is sufficient to support an officer's reasonable suspicion is a question of law that we review de novo. *Madden v. State*, 242 S.W.3d 504, 517 (Tex. Crim. App. 2007).

A detention based on reasonable suspicion must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *Royer*, 460 U.S. at 500. Although the length of a detention may render a traffic stop unreasonable, there is no rigid, bright-line time limitation. *United States v. Sharpe*, 470 U.S. 675, 685 (1985); *Love v. State*, 252 S.W.3d 684, 687 (Tex. App.—Texarkana 2008, pet. ref'd); *Belcher v. State*, 244 S.W.3d 531, 539 (Tex. App.—Fort Worth 2007, no pet.). Instead, common sense and ordinary human experience must govern over rigid criteria. *Sharpe*, 470 U.S. at 685; *Love*, 252 S.W.3d at 687; *Belcher*, 244 S.W.3d at 539. The reasonableness of the duration of a detention depends on whether the police diligently pursued a means of investigation that was likely to confirm or dispel any suspicions quickly, during which time it was necessary to detain the defendant. *Sharpe*, 470 U.S. at 686; *Love*, 252 S.W.3d at 687; *Belcher*, 244 S.W.3d at 539.

*Application of Law to Facts*

Appellant does not challenge the legality of the original traffic stop for speeding. He focuses on two periods of time in his brief: 12:44 p.m. to 1:03 p.m. and 1:03 p.m. to 1:50 p.m. He argues that detaining him during both of these periods of time was "patently unreasonable." Appellant apparently contends that the purpose of the original stop was satisfied at 12:43:18 p.m. after

8

Trooper Adkins discovered that neither he nor Pimpton had outstanding warrants and that, at that time, Trooper Adkins did not have reasonable suspicion to further detain him. Therefore, he contends that his detention after 12:44 p.m. was unlawful. The troopers discovered that the rental agreement was for the red Ford Fusion at 1:03 p.m. Appellant contends that this discovery did not give rise to reasonable suspicion to detain him and that, even if it had, the State cannot justify the earlier detention from 12:44 p.m. to 1:03 p.m. The State argues that Trooper Adkins had reasonable suspicion to detain appellant and that the duration of appellant's detention was reasonable.

We first address whether Trooper Adkins had reasonable suspicion to detain appellant. The stop occurred at 12:32 p.m. Trooper Adkins acted reasonably in approaching Pimpton and appellant and asking them for identification, information about the ownership of the vehicle, and information about their trip. *Davis*, 947 S.W.2d at 245 n.6; *Caraway*, 255 S.W.3d at 307; *Lambeth*, 221 S.W.3d at 836; *Freeman*, 62 S.W.3d at 887-88. He also acted reasonably in checking for outstanding warrants and criminal histories. *Kothe*, 152 S.W.3d at 63. Within about ten minutes after the stop, Trooper Adkins learned the criminal history information. Thus, the record shows that Trooper Adkins conducted his investigation of the speeding violation in a diligent and timely fashion.

Based on his investigation of the traffic offense, Trooper Adkins discovered a number of facts that led him to suspect that Pimpton and appellant were transporting narcotics. During his testimony, Trooper Adkins identified a number of facts that raised suspicions in his mind: (1) testimony, Pimpton did not take his wallet out of his pocket when he retrieved his license; (2) appellant continued to eat his hamburger; (3) Pimpton and appellant made conflicting statements about the length of their California trip; (4) the lack of luggage in the vehicle; (5) the vehicle was a third party rental vehicle; (6) the Tide soap box in the trunk of the vehicle; and (7) Pimpton's and appellant's criminal histories. In addition, at 12:40 p.m., Trooper Adkins stated into his microphone that appellant was acting really nervous and that his hands were shaking really bad.

Viewed in isolation, some of the above facts might not support a reasonable suspicion finding. However, conduct that may be innocent when viewed in isolation may give rise to reasonable suspicion when viewed in the light of the totality of the circumstances. *Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997). Based on his experience, Trooper Adkins knew that rental vehicles are used to traffic narcotics; that detergents are used to mask the odor of narcotics;

9

and that, in cases involving seizures of large amounts of narcotics and currency, "not a lot of luggage is taken." Appellant's and Pimpton's lengthy criminal histories included numerous drug offenses. The criminal histories, when combined with the other facts, provided strong support for Trooper Adkins's conclusion that he had reasonable suspicion to detain Pimpton and appellant. Based on the totality of the circumstances, we conclude that Trooper Adkins possessed specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that appellant was engaging in criminal activity and that, therefore, Trooper Adkins had reasonable suspicion to detain him.

Appellant relies on the following cases to support his contention that Trooper Adkins did not have reasonable suspicion to detain him: *Herrera v. State*, 80 S.W.3d 283 (Tex. App.—Texarkana 2002, pet. ref'd); *McQuarters v. State*, 58 S.W.3d 250 (Tex. App.—Fort Worth 2001, pet. ref'd); and *Veal v. State*, 28 S.W.3d 832 (Tex. App.—Beaumont 2000, pet. ref'd).[3] The nature of the specific, articulable facts that were known to Trooper Adkins in this case distinguishes it from the cases cited by appellant. For example, there was no evidence in the cases cited by appellant that the detainees had lengthy criminal histories that included arrests for drug offenses.

We now address whether the duration of appellant's detention was reasonable. The drug dog alerted on the vehicle about seventy minutes after Trooper Adkins discovered the criminal histories. A seventy-minute detention is not unreasonable per se. *Strauss v. State*, 121 S.W.3d 486, 492 (Tex. App.—Amarillo 2003, pet. ref'd) (A seventy-five-minute detention from the stop until the drug dog arrived was not unreasonable.); *Josey v. State*, 981 S.W.2d 831, 840-41 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd) (A ninety-minute detention from the stop until the officers searched the vehicle was not unreasonable.). Rather, the reasonableness of the duration of appellant's detention depends on whether Trooper Adkins diligently pursued a means of investigation that was likely to confirm or dispel his suspicions quickly. *Sharpe*, 470 U.S. at 686. A free-air sniff by a trained drug dog is recognized as a minimally intrusive method of investigation for an officer to confirm or dispel

---

[3]Appellant also relies on *Parker v. State*, 182 S.W.3d 923 (Tex. Crim. App. 2006). However, the issue in *Parker* was whether the defendant had standing to contest a search of a vehicle. The court did not address whether the officer had reasonable suspicion to detain the defendant.

his suspicions of the presence of narcotics. *See Strauss*, 121 S.W.3d at 492; *Josey*, 981 S.W.2d at 841.

After Pimpton denied consent to search the vehicle, Trooper Adkins returned to his vehicle and attempted to locate an available canine officer. Trooper Adkins made numerous phone calls over an eighteen-minute period in an attempt to find a canine officer. He determined that the canine officer in Sweetwater was unavailable. At 1:10:40 p.m., he called Trooper Mueller, and Trooper Mueller agreed to assist him. At the time, Trooper Mueller was thirty or forty minutes away from the scene. Trooper Mueller arrived with his drug dog at the scene at 1:50 p.m. When the drug dog arrived at the scene, it quickly confirmed Trooper Adkins's suspicions. The drug dog alerted on the vehicle within three or four minutes after arriving at the scene. Once the drug dog alerted on the vehicle, Trooper Adkins's reasonable suspicion ripened into probable cause to search the vehicle. *Harrison v. State*, 7 S.W.3d 309, 311 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd); *Josey*, 981 S.W.2d at 846; *Ortiz v State*, 930 S.W.2d 849, 856 (Tex. App.—Tyler 1996, no pet.). We conclude that Trooper Adkins diligently pursued a means of investigation that was likely to confirm or dispel his suspicions quickly and that, therefore, the duration of appellant's detention was reasonable. *See Love*, 252 S.W.3d at 688.

Because Trooper Adkins had reasonable suspicion to detain appellant and because the duration of appellant's detention was reasonable, the trial court did not abuse its discretion in denying appellant's motion to suppress. We overrule appellant's sole issue.

*This Court's Ruling*

We affirm the judgment of the trial court.

TERRY McCALL
JUSTICE

September 10, 2009

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.

11