**Affirmed as modified; Opinion Filed August 20, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-17-00492-CR

**MARK DAVID ZIMMERMAN, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 397th Judicial District Court**
**Grayson County, Texas**
**Trial Court Cause No. 067724**

## MEMORANDUM OPINION
Before Justices Lang, Myers, and Stoddart
Opinion by Justice Myers

A jury convicted Mark David Zimmerman of four drug-related offenses: (1) possession with intent to deliver more than 400 grams of gamma hydroxybutyric acid (GHB); (2) possession of four ounces or more but less than five pounds of marijuana; (3) possession of less than one gram of methamphetamine; and (4) possession of less than one gram of tetrahydrocannabinol. The State alleged drug-free zone and habitual offender enhancements. The jury found the enhancement allegations to be true and assessed punishment at ninety-nine years' imprisonment and a $100,000 fine for possessing more than 400 grams of GHB; for the other three counts, the jury assessed punishment for each offense at fifteen years' imprisonment and a $10,000 fine. Appellant brings two issues, contending the trial court erred in denying appellant's pretrial motion to suppress and that the trial court lacked the authority to order $180 in restitution for lab fees. The State responds

that the trial court did not err in denying the motion to suppress, but that the restitution order was an abuse of discretion and should be set aside. As modified, we affirm.

<b>BACKGROUND AND PROCEDURAL HISTORY</b>

Officer Cory Goodman was the K-9 officer for the Whitesboro Police Department and was patrolling with his K-9 partner, Ninja. Goodman was a seven-year police department veteran who was certified as a K-9 handler and had been trained in narcotics interdiction. At around 10:24 p.m. on the night of June 7, 2016, Goodman observed a silver Mercedes SUV with a defective license plate light driving westbound on Highway 82 in Grayson County, Texas. Officer Goodman's body camera recorded the subsequent interaction he had with the driver of that vehicle, appellant.

About thirty seconds after initiating the stop, Goodman approached the driver's side door of the vehicle and asked appellant for his driver's license and proof of insurance. Appellant complied, producing a Colorado driver's license as identification. Appellant asked why he had been pulled over, and the officer said he had a "tag light out." The officer asked appellant if he knew that, and appellant said he did not. The officer then quickly added, "I'm not going to give you a ticket for a tag light or anything, no, nothing like that." He asked appellant, "So what brings you down to Texas?" Appellant said he was "pretty much from Texas," that he "grew up here," that his "brother is from here," and that he was "cutting out of here" and "going on vacation." The officer asked appellant where he was going on vacation, and appellant said he going to visit some family in Colorado, then going to Las Vegas. The officer asked, "So, uh, whereabouts are you living now?" Appellant replied, "Right now I was just actually staying in Austin Ranch, over in The Colony." Goodman asked appellant if he was heading to Colorado now, and appellant said he was. The officer inquired, "Have you ever been in trouble with the law or anything?" Appellant replied, "Uh, not in quite some time." The officer asked appellant "[w]hen was the last time," and appellant replied, "Eight, nine years ago." Goodman asked if it was for "[a]nything serious," to

–2–

which appellant said, "Not too serious."

The body camera video shows Officer Goodman walking back to his patrol car and asking Whitesboro dispatch to check appellant's driver's license, criminal history, and search for outstanding warrants. He also checked the vehicle registration information. During the hearing on appellant's pretrial motion to suppress, Goodman testified that appellant's driver's license was clear and valid, as was the proof of insurance. The vehicle registration information was in good order. There were no outstanding warrants for appellant. But the "[c]riminal history revealed multiple possession, misdemeanor possession, and [a] manufacture/delivery of controlled substance arrest." Goodman added that appellant had two offenses that were in penalty group two. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.103, 481.113. "[A]t that point," Goodman testified, he believed, based on his training in narcotics interdiction, that appellant was "transporting narcotics" or was "in some type of illegal activity" because appellant's "story [was] not really adding up for a long-distance travel, and he avoided multiple questions as to his criminal history, answering not serious criminal history, things along that nature." Goodman also testified that he saw only "a very small bag" on the floorboard inside appellant's vehicle, which the officer believed was "not typical for a long-distance trip[,] as he was talking about."

Goodman testified that he did not detect the odor of marijuana or anything else of an illegal nature, and appellant did not appear to be under the influence of any drugs or alcohol. Nor did the officer notice anything of an illegal nature in plain view. Appellant made good eye contact. When asked if appellant appeared to be in any way nervous, Goodman testified that he was "[n]ot too extremely nervous."

After receiving criminal history information from dispatch that was inconsistent with appellant's statements, Officer Goodman returned to appellant's vehicle, pausing to shine his flashlight into the back of the SUV. Goodman testified that, for officer safety because of the traffic

–3–

on the highway, he asked appellant to step out of the vehicle so that he talk with him further. As appellant was about to get out of the vehicle, Goodman asked him if he had "no weapons or anything on you, is there?" Appellant started reaching for something with his left hand, and Goodman told him, "No reach, no reach. What you got? Knife?" Then appellant said, "No, I got a paperweight." Appellant removed brass knuckles from his left pocket and, at Goodman's request, handed them over to the officer. Goodman asked appellant to walk to the back of the vehicle, and then asked him if he had any other weapons on him. Appellant said, "No."

Goodman patted appellant down, after which the officer told appellant that he did drug interdiction and that he noticed appellant had a couple of convictions for possession of marijuana, and another for manufacture/delivery. He asked appellant if there was anything illegal inside of the vehicle. Appellant said, apparently referring to his criminal history, that "[a]ll of that stuff was from a long time ago." Goodman asked, "There's no more of that going on now?" Appellant said, "No, sir," and quickly added, "I've been very, very good." Appellant told the officer he had his own company and that if Goodman was interested in "VIP" asset protection, "That's actually what I do." Appellant added that he hires exclusively officers and ex-military. Goodman continued to question appellant, asking him, "Now, you live in The Colony?" Appellant said he was staying in The Colony with an older woman; that he had lived there before; and that he had moved back to Texas from Colorado.

Goodman and appellant had been standing behind the SUV while they talked, and the sound of several passing vehicles could be heard on the body camera video. Goodman said he was concerned about standing so close to the highway, and he asked appellant to move. They both moved over to the side of the road, after which appellant said, "Now, I think I'm moving back for a little bit." Appellant paused before adding that he was going to do this "after I get done with my vacation." Goodman asked appellant how long he had been in Texas, and appellant said he had

been here for the "past couple of months." While Goodman questioned appellant, another officer who arrived on the scene during the traffic stop, Officer Pruitt, joined Goodman. On the video, he can be seen standing next to appellant's vehicle and looking inside as Goodman continued questioning appellant.

Officer Goodman asked appellant if was originally from Texas, to which appellant said his father moved to Texas when appellant was about six months old, and that he had "pretty much" lived in Texas, mostly the DFW area, since that time. Goodman said that he noticed appellant did not have very much luggage in his car, and he asked appellant if was going to Las Vegas "on a whim." Appellant said he had his backpack and a "couple of changes of clothes" in the back of his car, and that was all he needed. Appellant added that he "figure[d]" he would buy everything else that he needed and "put it on the corporate card."

Officer Goodman asked again, "Okay, so there's nothing illegal inside of that vehicle," to which appellant said, "No, sir, there is not." Goodman asked appellant if he had any problem with the officer searching the vehicle. Appellant said he did not consent to a search, and that he wanted to be on his way. Goodman advised appellant he had a K-9 in his car and that he alerts on narcotics, specifically marijuana, cocaine, methamphetamine, heroin, and ecstasy. He asked appellant if any of those substances were in the car, and that "if it is in that vehicle he will alert on it." Appellant again said he did not consent to any search of his vehicle.

The officer told appellant that he was going to "run" the dog now, and that he did not need appellant's consent to do that. Goodman added, "I was just giving you the opportunity to be honest with me; if there's something in that vehicle he is going to alert on it." Appellant said, "I don't believe there is; the vehicle has been borrowed by a few people in the past." While Goodman was walking to get Ninja, Officer Pruitt could be heard on the body camera video telling Goodman that he saw what looked "like about four glassine bags" of marijuana sticking out of a partially

–5–

unzipped cooler in the center of the back seat of the vehicle. Goodman responded by stating that he would see if Ninja would "alert in that area."

The video from Goodman's body camera shows that Ninja alerted on three areas of appellant's vehicle—the open window on the driver's door, the front passenger side of the vehicle, and the right rear passenger side. Upon receiving these alerts, Goodman handcuffed appellant and placed him in the back of the patrol car. Goodman told appellant he was being placed under arrest for the brass knuckles, a prohibited weapon. *See* TEX. PENAL CODE ANN. § 46.05.

Officers Goodman and Pruitt searched the vehicle, finding a loaded .38 revolver in the driver's door. Nearby, also on the front driver's side, the officers found a meth pipe that contained a caked white residue. And in the rear passenger area of the vehicle, inside a clear plastic bag that was stowed in an insulated cooler bag, the officers found "[a] large amount of marijuana."

According to evidence introduced at trial, the officers also found a 7 mm Remington rifle (with three rounds in the magazine), a smaller amount of marijuana in the front passenger side of the vehicle, THC extract patches, a white brick substance, scales, glassine baggies, drug paraphernalia, a brown substance in a plastic container, approximately five hundred dollars in cash, and a Gatorade bottle with a clear substance inside that did not smell like Gatorade. The marijuana found in the cooler weighed 4.12 ounces. Trial testimony further showed that the white brick substance contained lidocaine, the pipe contained a net weight of .06 grams of methamphetamine, the THC extract patches contained a net weight of .75 grams of tetrahydrocannabinol, and the clear substance in the Gatorade bottle contained GHB. The net weight of the liquid in which the GHB was found totaled 452.01 grams.

Appellant filed a pretrial motion to suppress evidence, arguing the arresting officer did not have any reasonable suspicion to extend the routine traffic stop, and that the drug-detecting dog was used during the ensuing illegal search. Following a pretrial hearing on the motion to suppress,

which was held on March 7, 2017, the trial court informed the parties by letter dated March 28, 2017 that after consideration of the video and the arguments of counsel, the court was going to deny the motion to suppress.

Appellant was subsequently convicted of all four counts alleged in the amended indictment. During the punishment phase of the trial, the State sought the drug-free zone enhancement (i.e., committing the offenses in, on, or within 1,000 feet of the premises of a school) and the habitual offender enhancement (i.e., two prior felony convictions for aggravated assault with a deadly weapon on December 9, 2009; and one for possession with intent to deliver four grams or more but less than 400 of methylenedioxymethamphetamine (MDMA) on October 1, 2010). Appellant pleaded "not true" to the enhancement allegations. The jury found each the enhancement allegations to be true and assessed punishment at ninety-nine years' imprisonment and a $100,000 fine for possessing more than 400 grams of GHB. For the other three counts, the jury assessed punishment for each offense at fifteen years' imprisonment and a $10,000 fine. The sentences were ordered to run concurrently. Appellant filed a motion for new trial that was overruled by operation of law. This appeal followed.

DISCUSSION

### 1. Motion to Suppress

In his first issue, appellant contends the trial court erred in denying appellant's pretrial motion to suppress because the officer did not have specific articulable facts to prolong the detention beyond the mission of the traffic stop.

We review a trial court's ruling on a motion to suppress using a bifurcated standard of review, affording almost total deference to a trial court's determination of historical facts. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). The trial court is the sole trier of fact and the judge of the credibility of the witnesses and the weight to be given to their testimony.

–7–

*Id.* It is entitled to believe or disbelieve all or part of the witness's testimony—even if that testimony is uncontroverted—because it has the opportunity to observe the witness's demeanor and appearance. *Id.* When, as in this case, no findings of fact are entered, we view the evidence in the light most favorable to the trial court's ruling and assume the trial court made implicit findings of fact that support its ruling so long as those findings are supported by the record. *Id.* We review a trial court's application of the law of search and seizure to the facts de novo. *Id.* We will sustain the trial court's ruling if that ruling is reasonably supported by the record and is correct under any theory of law applicable to the case. *Id.* at 448.

Under the Fourth Amendment, a warrantless detention of a person that amounts to less than a full-blown custodial arrest must be justified by a reasonable suspicion. *Derichsweller v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011). Reasonable suspicion exists if the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude a particular person actually is, has been, or soon will be engaged in criminal activity. *Castro v. State*, 227 S.W.3d 737, 741 (Tex. Crim. App. 2007). In other words, those specific, articulable facts must show unusual activity, some evidence that connects the detained individual to the unusual activity, and some indication that the unusual activity is related to crime. *Derichsweiler*, 348 S.W.3d at 916. Additionally, whether reasonable suspicion exists is based on an objective standard that disregards the officer's subjective intent. *Furr v. State*, 499 S.W.3d 872, 878 (Tex. Crim. App. 2016). Furthermore, circumstances that an officer relies on "'must be sufficiently distinguishable from that of innocent people under the same circumstances as to clearly, if not conclusively, set the suspect apart from them.'" *Wade v. State*, 422 S.W.3d 661, 670 (Tex. Crim. App. 2013) (quoting *Crockett v. State*, 803 S.W.3d 308, 311 (Tex. Crim. App. 1991)).

A traffic stop is a detention, and it must be reasonable under the United States and Texas

constitutions. *See Davis v. State*, 947 S.W.2d 240, 245 (Tex. Crim. App. 1997). To be reasonable, the traffic stop "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *See Florida v. Royer*, 460 U.S. 491, 500 (1983); *Davis*, 947 S.W.2d at 245. Determining whether an investigative detention is reasonable is a two-pronged inquiry, focusing first on whether the officer's action was justified at its inception and then on whether the action "was reasonably related, in scope, to the circumstances that justified the stop in the first place." *Kothe v. State*, 152 S.W.3d 54, 63 (Tex. Crim. App. 2004). This is a factual determination made by considering the totality of the circumstances existing throughout the detention. *Belcher v. State*, 244 S.W.3d 531, 538–39 (Tex. App.—Fort Worth 2007, no pet.). Also, an investigative stop that "is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Davis*, 947 S.W.2d at 243;

As for the length of the detention, "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." *United States v. Place*, 462 U.S. 696, 709 (1983). But there is no rigid time limit. *See St. George v. State*, 237 S.W.3d 720, 727 (Tex. Crim. App. 2007); *State v. Taylor*, No. 05–15–01542–CR, 2016 WL 6135521, at *4 (Tex. App.—Dallas 2016, pet. ref'd) (mem. op., not designated for publication). Instead, the issue is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly. . . ." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

The "tolerable duration" of the stop "is determined by the seizure's 'mission,' which is to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. U.S.*, 135 S. Ct. 1609, 1614 (2015) (citation omitted). Consequently, during a routine traffic stop, police officers may request a driver's license and car registration to conduct a computer check on that information. *See Kothe*, 152 S.W.3d at 63. A request for insurance information, the

driver's destination, and the purpose of the trip are also proper inquiries. *Ortiz v. State*, 930 S.W.2d 849, 856 (Tex. App.—Tyler 1996, no pet.). However, an officer "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 135 S. Ct. at 1615. "[T]he stop may not be used as a 'fishing expedition for unrelated criminal activity.'" *Davis*, 947 S.W.2d at 243 (quoting *Ohio v. Robinette*, 519 U.S. 33, 41 (1996) (Ginsberg, J., concurring)).

Generally, a traffic stop investigation is fully resolved after the computer check is completed and the officer knows the driver has a valid license, no outstanding warrants, and the car is not stolen. *Kothe*, 152 S.W.3d at 63–64. The detention must end at this point and the driver must be allowed to leave unless there is another proper basis for the investigatory detention. *Id.* at 64. There must, in other words, be reasonable suspicion regarding a different offense to support further detention. *See Rodriguez*, 135 S. Ct. at 1615; *Davis*, 947 S.W.2d at 243; *Taylor*, 2016 WL 6135521, at *4. In addition, a dog sniff is aimed at detecting ordinary criminal wrongdoing and is not an ordinary incident of a traffic stop. *Rodriguez*, 135 S. Ct. at 1615 ("[A] dog sniff is not fairly characterized as part of the officer's traffic mission."); *Taylor*, 2016 WL 6135521, at *4. Absent facts showing reasonable suspicion that a different offense has been, is being, or soon will be committed, the officer may not prolong the traffic stop to conduct a dog sniff. *Rodriguez*, 135 S. Ct. at 1614–16; *Taylor*, 2016 WL 6135521, at *4.

Officer Goodman was justified in stopping appellant's vehicle. "For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). The reason given by Goodman for stopping appellant was a traffic violation—a defective license plate light. Failure to have an illuminated license plate light while other driving lights—i.e., headlights—are

illuminated is a violation of the transportation code. *See* TEX. TRANSP. CODE ANN. § 547.322(g) ("A taillamp, including a separate lamp used to illuminate a rear license plate, must emit a light when a headlamp or other auxiliary driving lamp is lighted."). Appellant does not dispute that Goodman was justified in stopping his vehicle.

The evidence showed appellant's driver's license and insurance information was valid, the vehicle registration information was in good order, and there were no outstanding warrants. Furthermore, Goodman told appellant that he was not going to ticket him for the traffic offense, i.e., he was "not going to give you a ticket for a tag light." The purpose of the traffic stop having been completed, Goodman, therefore, could not prolong appellant's detention unless he had reasonable suspicion of additional criminal activity. *See Rodriguez*, 135 S. Ct. at 1614 (authority for traffic stop ends when tasks tied to infraction are complete).

The State argues the officer had reasonable suspicion to prolong appellant's detention based on the totality of the circumstances. More specifically, it points to the fact that (1) appellant misrepresented his criminal history; (2) he had one small bag for a long-distance trip; and (3) he had prior convictions for marijuana possession and manufacture/delivery of a controlled substance.

The video from Goodman's body camera shows that when the officer asked appellant about his travel plans, appellant said he was going on vacation—first to visit family in Colorado, and then to Las Vegas. Although appellant had a Colorado driver's license, he told the officer he was currently living in Austin Ranch, in The Colony. Goodman asked appellant if he had been in trouble with the law, to which appellant responded, "Uh, not quite in some time." The officer asked appellant "[w]hen was the last time," and appellant replied, "Eight, nine years ago." Goodman asked if it was for "[a]nything serious," and appellant said, "Not too serious."

Appellant's criminal history, however, included multiple drug-related offenses, i.e., multiple possession, misdemeanor possession, and a manufacture/delivery of a controlled

–11–

substance arrest, according to Officer Goodman's testimony. Further, when Goodman—an experienced narcotics interdiction officer—was asking appellant about his criminal history, the video from the officer's body camera showed appellant's hesitancy about directly answering questions regarding the severity of his criminal history. The officer also testified that he saw only "a very small bag" on the floorboard inside appellant's vehicle, which the officer believed was unusual for a long-distance trip.

A stop may not exceed its permissible duration unless the officer has reasonable suspicion of criminal activity, but if the initial, routine questioning generates reasonable suspicion of other criminal activity, the stop may be lengthened to accommodate its new justification. *See Rodriguez*, 135 S. Ct. at 1615; *Davis*, 947 S.W.2d at 243. A defendant's criminal history cannot alone form the basis for reasonable suspicion. *See Hamal v. State*, 390 S.W.3d 302, 308 (Tex. Crim. App. 2012). But it is a factor that may be considered in determining reasonable suspicion, and deception regarding one's own criminal record is likewise a factor that can contribute to reasonable suspicion. *See id*. (defendant responding no when asked if she had ever been in trouble with the law before, when she had previously been arrested nine times, including four times for possession of a controlled substance, was factor in reasonable suspicion analysis; and defendant falsely stating that her arrests were "a long time ago" when her most recent arrest occurred seven months earlier reinforced existence of reasonable suspicion); *see also Parker v. State*, 297 S.W.3d 803, 811 (Tex. App.—Eastland 2009, pet. ref'd) (lengthy criminal history, including numerous drug-related offenses, considered as part of the reasonable suspicion analysis); *Coleman v. State*, 188 S.W.3d 708, 718–19 (Tex. App.—Tyler 2005, pet. ref'd) (same); *Powell v. State*, 5 S.W.3d 369, 378 (Tex. App.—Texarkana 1999, pet. ref'd) (same); *Morris v. State*, No. 07–06–00141–CR, 2006 WL 3193724, at *3 (Tex. App.—Amarillo Nov. 6, 2006, no pet.) (mem. op., not designated for publication) (same).

The trial court could have reasonably found, based on the videotape of the stop and Officer Goodman's testimony, that a reasonable officer would have believed appellant was being deceptive regarding his criminal history when he told the officer, in response to the officer's question whether it was "[a]nything serious," that it was "[n]ot too serious." Appellant argues that Goodman's "hunch that criminal activity was afoot" is an insufficient basis for finding the continued questioning of appellant to be justified. But when the evidence in this case is viewed in an objective manner—e.g., appellant was traveling late at night, his demeanor during the stop as shown by the videotape, his deception regarding his criminal history and the revelation his criminal history included multiple drug-related offenses, the fact he had "a very small bag" for what appeared to be a long-distance trip—it supplied the articulable facts to support reasonable suspicion. In addition, this reasonable suspicion was reinforced by subsequent statements because what appellant claimed was a "paperweight" turned out to be brass knuckles, a prohibited weapon. Also, Officer Pruitt could be heard on the body camera video telling Officer Goodman prior to conducting the K-9 open-air sniff that he saw what looked "like about four glassine bags" of marijuana protruding from a partially unzipped cooler in the back seat of the vehicle.

We conclude that the facts and the reasonable inferences drawn therefrom are sufficient to support the conclusion that appellant was engaged in or soon would be engaged in criminal activity. Therefore, we cannot say the trial court erred in denying appellant's motion to suppress, and we overrule appellant's first issue.

### 2. Restitution Order

In his second issue, appellant contends the trial court lacked the authority to order restitution for lab fees.

The record reflects that after pronouncing appellant's sentence, the trial court asked the prosecutor, "How much restitution was there for lab fees?" and the prosecutor responded, "$180,

Your Honor." The trial court ordered, "There will be $180 of restitution." The $180 restitution is incorporated into the trial court's final judgment and bill of costs. Although the judgment does not state to whom the $180 in restitution is owed, the record shows it was intended for the payment of "lab fees."

In this case, appellant was sentenced to imprisonment. Thus, the trial court had no authority to order appellant to reimburse DPS, and DPS lab fees are not properly subject to a restitution order under article 42.037(a). *See Aguilar v. State*, 279 S.W.3d 350, 353 (Tex. App.—Austin 2007, no pet.); *see also* TEX. CODE CRIM. PROC. ANN. art. 42.037(a). The State agrees the $180 restitution order was an abuse of discretion and that the judgment should be modified to delete the restitution order.

We have the authority to modify a judgment to make the record speak the truth when we have the necessary data and information to do so. *Brewer v. State*, 572 S.W.2d 719, 723 (Tex. Crim. App. 1978); *Ingram v. State*, 261 S.W.3d 749, 754 (Tex. App.—Tyler 2008, no pet.); *Davis v. State*, 323 S.W.3d 190, 198 (Tex. App.—Dallas 2008, pet. ref'd). Accordingly, we will modify the judgment to delete the $180 in restitution. *See* TEX. R. APP. P. 43.2(b); *see also Brewer*, 572 S.W.2d at 723; *Ingram*, 261 S.W.3d at 754; *Davis*, 323 S.W.3d at 198.

As modified, we affirm the trial court's judgment.

/Lana Myers/
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. 47.2(b).
170492F.U05

–14–



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

MARK DAVID ZIMMERMAN, Appellant

No. 05-17-00492-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 397th Judicial District Court, Grayson County, Texas
Trial Court Cause No. 067724.
Opinion delivered by Justice Myers.
Justices Lang and Stoddart participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

The section entitled "Restitution" is modified to show "N/A."

As modified, we **AFFIRM** the trial court's judgment.

Judgment entered this 20th day of August, 2018.